Peace of the Day, which is Upside Foods v. the Commissioner, 24-13640. We've got Mr. Sherman here for the appellant, Mr. Norby, Mr. Muehlhoff here for the appellees. Mr. Sherman, whenever you're ready. Thank you, Your Honors, and may it please the Court, I'm Paul Sherman for the appellant to Upside Foods. I'm joined by Sir Ranjan Sen, my co-counsel from the Institute for Justice. Your Honors, this is a straightforward case of express federal preemption. Before we get to the merits, can we talk about mootness? Certainly, Your Honors. At least for my purposes, can you explain to me why your amendment of the complaint before you filed the appeal doesn't moot the appeal? Your Honor, the reason why the case is not moot can be found in Johnson v. 3M Company. Is Johnson a case in which the amendment predated the appeal? I do not know the answer to that. The answer is no, and if the answer is no, why shouldn't that matter? I mean, it just strikes me. Maybe this is just like the most simplistic way of thinking about this imaginable, but the way I have typically thought about jurisdiction working is that only one court can have the thing at a time. So it's different. If there's an appeal, and then, like, so now we have the thing, and there's this little skirmish going down below, and perhaps there's an amendment. Now we've got some case law about whether or not that skirmish ought to moot out our appeal. But when the amendment predates the appeal, it's like we never got the thing. It's like you appealed a non-thing. I don't think that's correct, Your Honor, because we appealed under 1292, and 1292 grants this court the jurisdiction to hear interlocutory appeals of orders granting or denying preliminary injunctions. Wasn't the P.I. in service of the initial complaint? Right? I mean, like, it doesn't exist in the ether, the request for the P.I. Like, you file a complaint, and on the basis of that complaint, you seek a P.I., right? Your Honor, I really think that this is maybe more formalistic than the federal rules require. This is not a limitation that appears in the text of section 1292. Section 1292 does have limitations that appear in it, and what this court has held about mootness on appeal is that a case becomes moot on appeal only when it is impossible for the court to grant effectual relief to the appellant. Now here, I don't think anyone would argue that it would be impossible for the court to grant effectual relief. The case is going on below, and even the government, in its motion to dismiss below, at pages six to seven, docket 54 of the state attorney's motion to dismiss, said that the amendments to the complaint did not substantively change our argument. I agree. I agree it's pretty formalistic, and maybe I'm sort of captive to my own formalism, but it just seems that the P.I. doesn't sort of, like, exist, as I said, I guess, in the ether. It's like sort of adjacent to the complaint, and if the complaint that forms the basis of the P.I. request is itself amended and sort of evanesces, it itself becomes a nullity. I don't really know how the P.I. continues to exist independently. Your Honor, I frankly just don't think that that is a limitation that appears in the text of section 1292, and I think the text of 1292 sets out the scope of this court's jurisdiction. Let me ask you this. Are there any cases, the Fifth Circuit Cemetery's case, which I know you probably think is wrong, but are there any cases other than that in which the posture is like this one, where there is an amendment, then an appeal, and a court says, we're good to go. The appellate court says, it's okay, we're good to go. So I don't know the precise timing of the amendment and the appeal, but the Second Circuit in State Farm Mutual Auto Insurance, which is 120F459, in that court, there was an amendment after a denial of a preliminary injunction. The court said, we agree with the reasoning of this court in Johnson v. 3M, and conclude that whether a revised pleading renders an appeal moot turns on whether that pleading materially changes the substantive basis for that appeal. So, see, I think, and I promise, I'm going to shut up because others have questions and you want to move on, but it just seems to me that perhaps it matters, it sounds like, I don't know the timing of the appeal there either, maybe one of my colleagues does, but it seems to me that the timing might matter, that if a revised pleading moots out a presently pending appeal, then that's sort of like a different body of law, whereas the one we have here, it's the revised pleading, does it sort of affect an appeal that has not yet been taken? Right? I mean, so let me ask you this, assume there had been no appeal, and you amend your complaint, what do you think the operative pleading is, the initial complaint or the amended complaint? I think the amended complaint would be the operative. So, at that point, then you file an appeal from the initial complaint. That's what happened here, right? There was an amendment, so now we have a new operative complaint, the old one is a nullity, and yet you appeal from a PI that is adjacent to that one. Your Honor, I think still again you're appealing from the denial of the preliminary injunction and that is what the scope of 1292 is. You might be right. Can I build on that because I think mootness is a threshold issue that we need to deal with. Certainly, Your Honor. While that's an issue with regard to the amendment, a larger issue is because Judge Walker kept the case or kept the thing, he did some additional rulings, one of which was to dismiss this  The case is now in the lower court, has been dismissed for two reasons. One, because he found that even though your client had a right to bring a private action, typically based on actual injury, Article III injury, it was precluded or preempted from bringing any action because of the language in the Poultry Protection Inspection Act to begin with. That statute has this provision, quote, all proceedings for the enforcement or restraint violations of this chapter shall be by and in the name of the United States. Judge Walker said, yes, as I did in my original order, I found that your client had standing in the usual sense, but now he said because of that provision, the government has preempted any right to bring any action to enforce the PPIA. We have a lot of acronyms in this case. So just to disentangle . . . Isn't that what occurred below? Then he said, even assuming you had the right to bring the action, there wasn't this preemption by the words in the statute itself. He then went ahead and ruled on the merits and dismissed the case. So just to disentangle a couple of things with the dismissal below. The dismissal below was only a partial dismissal. It did not dismiss the dormant commerce claims, which are live and moving forward. But this, before us, was not brought on the dormant case. It was brought specifically on 1883, wasn't it, the then existing count. That is gone. But Your Honor, a case only becomes moot on appeal if it is impossible to grant effectual relief. Under the doctrine of merger, a complete dismissal of all the claims by all of the parties will moot a case. But a partial dismissal is not. You said you don't have the right to bring this because the government has the exclusive right to bring cases with regard to violations of the Act or to enforce the Act. Yes, Your Honor. That's what you're doing here. But that does not go to mootness. That goes to cause of action, which is not jurisdictional. And that argument is incorrect. One way to address the mootness issue is, do district courts control what we can do? No, Your Honor. District courts do not. So if a district court dismisses a claim, does that mean that we cannot grant relief on that claim as an appellate court that reviews what district courts do? No, it does not, Your Honor. So you can continue pursuing this claim in the district court because it's not over in the district court. The district court could change its mind, right? Certainly the district court could change its mind. And I think in order from this court . . . Yeah, one way it could change its mind is we could tell it that it was wrong. Yeah. If this court holds that we have a likelihood of success on the merits, I think it's very likely Judge Walker would change his mind. And if we told the district court you have to grant the preliminary injunction, the district court would grant the preliminary injunction? Certainly would, Your Honor. That would be if he decided only on the issue of likelihood of success. That doesn't deal with the issue of whether you can bring the case into first place. Right. And so to get to your point about Section 467C, Judge Hawk, that provision does not apply to lawsuits like this seeking to hold that a state law is preempted under federal law. I think it's noteworthy that in the entire history of the PPIA, no lawsuit has ever been brought by the United States. You're not suing a chicken processing plant for violating the PPIA, right? No, we are not, Your Honor. You're suing the state of Florida and saying, state of Florida, you're not allowed to enforce your state law against . . . That is exactly right. And you've said over and over again that there are those kinds of things. Yes, Your Honor. And the text of the statute says that only the United States can enforce the statute, but you're not seeking to enforce the statute. Correct, Your Honor. Because Florida doesn't have any obligations under the statute, either. We are seeking to enforce our rights to be subject to the federal regulatory scheme exclusively. That's textbook preemption of the type that this court hears all the time. And I think you can look at other provisions . . . That issue has not been briefed before, has it? I'm sorry. The issue of whether what you're bringing below, in fact, is there or is not a violation and attempt to enforce a violation or interpret . . . Your Honor, all of this was briefed in the briefs before this court. The government made all of these arguments in its appellate briefing because appellate briefing was concluded before the district court granted its motion to dismiss. So, the government argued we didn't have a cause of action under 467C. It argued that we didn't have a cause of action in equity . . . It argued that all proceedings for the enforcement and restraint violation of this chapter shall be by and in the name of the United States, that was briefed here? Yes, that was fully briefed, Your Honor. And the point that I'm making is that violations of the PPIA in the relevant sense are violations of the substantive provisions of the PPIA. And in fact, you can look at its section 461 of the PPIA, 21 U.S.C. 461, and it talks about any person who violates the provisions of . . . and then it says sections 458, 59, 60, 63, 66. These are all the regulations that are imposed on poultry producers. But there was, I think, never any intent on Congress to foreclose this well-established equitable remedy. And once we get across that threshold, this Court concludes that these are poultry products, which Judge Walker correctly held below. Could you address that? How are these poultry products given that there was never a bird involved in . . . There was a bird, Your Honor. So, the definition of poultry product is broad. It contains any poultry carcass or any part of a poultry carcass or any product made from any part of a poultry carcass. In this case, Upside extracted cells from a poultry carcass. It then replicated those cells. Those cells were made from part of a poultry carcass. But they weren't . . . but the product . . . the way I understand . . . I mean, one way to understand, I guess, that statute is, we're asking whether the food product was made from a poultry product . . . process . . . poultry . . . We're not asking whether that's somewhere in the chain there was a chicken, right? So, I guess, you're seeming . . . you seem to suggest if there's somewhere in the chain there was a chicken, then the resulting food product is a poultry product. But isn't . . . doesn't the chicken have to be, like, in the poultry product itself? No, Your Honor. And this is the argument the government takes. And I think it mistakes made from for made . . . I'm sorry, it mistakes made of for made from. So, the PPIA says it has to be made from, not made of. In the same way, bourbon whiskey is made from corn. But no one would say that bourbon whiskey is made of corn, that it contains corn. So in the same . . . Is that right? I mean, maybe I'm not a hard enough thinker, but is that right? I mean, like, does bourbon not contain any corn, any corn residue, something? I don't think . . . so, well, under federal law, bourbon whiskey must be made from a mash that contains 51% corn. I think in the bottle itself, I don't think any ordinary speaker of English would say that that bottle contains corn. They would say it contains a product that was made from corn. The chicken cells that are an upsized product were made from chicken cells extracted from a poultry carcass. Isn't this more like . . . I mean, all these hypotheticals become a little silly, but isn't this more like saying a chicken is made from corn, right, because the chicken eats corn, and the chicken then turns that into chicken meat, and so you say chicken made from corn. Well, I think there's certainly a tighter connection between chicken cells extracted from a carcass and the duplication of those cells to make the product that my client ultimately wants to sell to consumers in Florida. You know, at the . . . Yeah, there is a tighter connection, but isn't it the same kind of idea? Yeah, you started with poultry product, but then you just came up with something else, and here it happens to be like, you know, molecularly the same thing. So, Your Honor, I would say that's not a limitation that appears in the text of the PPIA, and there are limitations in the text of the PPIA for certain types of poultry products, but only those that the Secretary of Health and Human Services has expressly said are not regulated under the PPIA. That has not happened here. To the contrary, the USDA's position is that these are poultry products and should be regulated as such, and I see that I'm into my . . . Let's talk about the ingredients provision. It says that the state cannot add on or have different than the provisions of the requirements of the statute, correct? So . . . What does the statute say? Yes, the state cannot impose any requirements . . . What does the sort of statute do to add on or different from? It differs from the federal requirements in that under the PPIA, cultivated poultry cells are allowed to be used . . . They're allowed, but they're not required. They don't have to be . . . It's something that's acceptable. That's correct. And no more. That's correct, Your Honor. It's regulated like any kind of other chicken. That's correct, Your Honor. And isn't this chicken, your chicken, cultivated chicken, essentially the same, made up of the same ingredients, chicken cells? The only difference being that one is in a chicken, goes in a chicken, and the other goes in . . . Yes, yes. So these cells . . . So the ingredients are exactly the same, chicken cells. So, but the government is saying that these particular chicken cells cannot be included. That is certainly a requirement that differs from the federal requirement because under the federal requirements, they are allowed to be included. The statute doesn't say anything about what . . . We're just saying if it's this type of chicken, we ban it. That's all it does. It doesn't reach into and say it has to be this way, it has to be that way. We're just saying we don't find this to be an acceptable version of chicken. I don't think the state has that power under the PPIA. It did under the horse meat case, the foie gras case. But what distinguishes those cases from this one is that in the foie gras case, for example, that dealt with animal husbandry practices while the chickens were alive, and the USDA said, we don't have any jurisdiction over the treatment of chickens while they're alive. Everything that is happening here is occurring . . . We don't regulate what they can sell or can't sell. Which is exactly what the state of Florida says. I don't care what you do in Berkeley, California, how you make your chicken filet or whatever it is, but we don't want it here. And that's all they're saying. You do whatever you want there in Berkeley, but we're not going to reach into your factory or whatever you call it. That's just me. We don't want it in the state of Florida. For whatever reason, whether it's to protect the chicken farmers, or whether it's because they think it's going to be the guinea pig, that kind of product. But Florida hasn't banned the slaughter of chickens for human consumption. What it has banned is the sale of a product based on the way it's made within an official establishment regulated by the USDA. That is the core of what the PPIA is intended to regulate. You couldn't set up a . . . If you'll move away from the ingredients thing, it seems to me your better argument for prevention is under manufacturing. This regulates the way you create chicken, right? Yep. You couldn't create chicken this way in Florida, right? No, you can't create it this way in Florida. And Florida will not allow you to sell it if it's created this way anywhere else, which is the National Meat Association case. So it's basically, Florida, by saying you can't sell this meat as long as it's manufactured this way, is telling you how you can manufacture meat in this way in the Florida market. That's correct, Your Honor. Ultimately, for our likelihood of success, it doesn't really matter whether this law is conceived of as an ingredients requirement or a facilities requirement. If this court finds that either of those are satisfied, then I think it's indisputable we've shown a likelihood of success, because the government, frankly, hasn't really tried to defend this on the merits of the PPIA preemption provisions. It's focused mostly on the mootness and cause of action. Yeah, well, I mean, but the district court, though, that was the basis of its ruling. The district court sort of assumed everything away and said, look . . . Yeah, and that's because the district court treated this as a conflict preemption theory instead of an express preemption, where you have to look at the text. And, you know, we filed that . . . That's not what Judge Walker did. He never used the word conflict. He used exact words in the statute, double time. And then he used kind of an inconsistency as a shorthand for that, in addition to or different than. He used that time and time again. So he didn't treat it as a conflict. He treated it as based on the statutory language. Well, but I think his understanding was that the statutory language required that there be a conflict in the sense of some kind of inconsistency where you cannot . . . I don't see that in his order. That's your interpretation, but I do not see that in his order. Well, in any event, I think the First Circuit's recent decision in Northwestern Selecta, which we submitted as supplemental authority, I think that goes very clearly to the breadth of these preemption provisions and also that there does not need to be any kind of conflict. All that matters is that Upside is subject to a single set of regulations, the federal set of regulations. Florida tries to prohibit a product that the federal government says, yes, when it's made this way in an official establishment, you can sell it. That is expressly preempted. Okay, very well. Let's hear from the government at Belize. Just so we understand, how are you guys proposing to split your time? Yes, sir. Our plan is for me to take the cause of action and mootness issues and for my colleague, Mr. Norby, to address preemption, both the interpretation and the actual merits. Okay, very well. Good morning, Your Honors. May it please the Court, Jason Muehlhoff for State Attorneys. I'd like to pick up on the Court's cause of action discussion, and especially in light of the focus order, also address any questions about the Declaratory Judgment Act or Georgia Latino. To start, Upside lacks a cause of action under the PPIA, equity. They definitely don't have action under the PPIA, right? They're not suing you for your chicken processing in Florida. Certainly. Both sides agree on that. They're saying that you can't enforce Florida law against them. Why don't they have an action to say that? Well, for a couple of reasons, Your Honor. First, turning to 21 U.S.C. Section 467, which Judge Huck has already mentioned, that makes clear – I'm sorry, I'm sorry. They're not suing under the PPIA, right? Yes. You just referred me to the PPIA. Sure. They're not suing under that. Yes, Your Honor. So why do they not have a cause of action? So the test under both equity and Section 1983 looks at has Congress displaced any cause of action through the statutory language? And so here you turn to the PPIA, and so what we have in Section 467. Let me ask you this hypothetical. If Florida prosecutes them for violating Florida law and selling this lab-grown chicken, can they raise the preemption argument and say, you're not allowed to prosecute us because of the PPIA? Yes. Then why can they not just bring the same thing against you and say, we want a declaration of our rights and we cannot be prosecuted for violating Florida law? So, Your Honor, there's the distinction between raising it in a defense in a proceeding versus trying to bring it as a pre-enforcement or a preemption challenge. Is that a distinction you're asking us to make up right now, or is that based on something else? No, Your Honor. We think that's clear from the Supreme Court's case in Armstrong, which, again, looks at cause of action raised in situations like this, and what it ultimately says is that Congress has the right to explicitly or implicitly limit any cause of action, including one, fraud and equity, which would be like the situation we were just talking about. And so then, again, you go to the text of the PPIA, and what we think is you have a remarkably clear displacement because it says, again, all proceedings for the enforcement or to restrain violations of the PPIA shall be brought by. But Florida's not being alleged to violate the PPIA, right? Florida's not a regulated entity under the PPIA, and they're not enforcing the PPIA against Florida. They're not saying you're violating the PPIA, therefore you have to close your chicken processing plant. So, Your Honor, what I think Upside has to say is that Florida, in enacting its law, is violating the PPIA, because to have... They're not interested in that. They just want you to not prosecute them for selling their lab-grown chicken. The same way that you just said that they could bring this if you were prosecuting them, they're just bringing it as a declaratory judgment action, saying you can't prosecute us. So, Your Honor, again, I think what they have to say is that what Florida is doing with its ban on self-cultivated chicken is imposing a requirement either on the manufacturing or on an ingredient. So the only way to win on a Supremacy Clause claim is to say that Florida's law violates in some way the PPIA. So I still think it's inescapable that at some point in its argument... It's just the thing, the state doesn't violate... The state can pass a law that is inconsistent with federal law all day long, and probably, like, if you look at Florida's statutes, they're, like, half of them are inconsistent with some kind of federal law in certain respects. And Florida's not being, like, put in jail for that, right? They're not being sued for that. They're not being fined for that. They haven't violated anything. But when it comes to it, they can't enforce some of those laws against some people some of the time. Certainly are, but the reason that they can't do it in some instances is because a court finds that they are in violation or clashing with some federal statute. So, again, we think under the Supremacy Clause that, to me, it always has to come back to, are the requirements under Florida law inconsistent or a direct conflict with the BPIA? But, again, stepping back, Your Honor, we think, one, that Congress has been clear here of displacing any equitable cause of action, which is the context here, or Section 1983, which is the same step in terms of looking at congressional displacement. We also think it's clear that here no personal right has been granted to upside, and, therefore, that also is an independent reason why they can't grant it. So all of this turns on the idea that they're trying to somehow enforce or restrain a violation of the PPIA, right? That's your no cause of action argument, based on that. Well, again, Your Honor, so for a cause of action under Equity or Section 1983, we are looking at the fairest reading of the text, here, the PPIA, and asking, has Congress granted them? No, they're not trying to, I mean, I guess, they're not bringing a cause of action for a violation of the PPIA, right? They're not. They're bringing either a 1983 claim or a declaratory judgment action to get, it's basically an Export of Young claim, saying, like, you can't prosecute us for violating the Florida law. We've said you can bring that kind of cause of action, right? Yes. So maybe one last pass, and then I'd like to turn to the Declaratory Judgment Act and Georgia Latino. I don't mean to speak past you, Judge, but I'm just trying to figure out, I mean, your whole argument really does depend on the interpretation of this. All proceedings for the enforcement or to restrain violation of this chapter shall be by and in the name of the United States, right? That's what, if we don't interpret that the way you want us to, they do have a cause of action. Not necessarily, because we think that the other thing they need to prove is that the PPIA grants them a certain right. And again, that's a high bar here, and we don't think... Okay, okay, where do you get that from, given that we've said, I mean, the case that we cited to you to look at, Georgia Latino, says that we have little difficulty in holding that plaintiffs have an implied right of action to assert a preemption claim seeking injunctive relief, right? We didn't ask whether the federal law that was doing the preempting gave them some kind of cause of action. We just said, look, you have a cause of action to say you can't prosecute me under this state law because of a federal law that conflicts with it. Certainly. To your first question, Judge Brasher, I will point you to the Supreme Court case, Gonzaga, there it says, or in the context of section 1983, the statute must grant rights and it must do so in clear and unambiguous terms. We think that's a high bar. If you're trying to enforce a statute, right? Yes. But we've said in the preemption context, you have the right to bring one of these injunctive claims. So what do you say about Georgia, I guess? What do you say where we said specifically you can literally bring exactly this case? So to Georgia Latino, Your Honor, two answers. The first is a broader point. The cause of action holding in Georgia Latino has been directly abrogated by Armstrong. So Georgia Latino starts by saying, we find at the beginning of the cause of action section and then footnote eight at the conclusion, they root the cause of action for a pre-enforcement challenge in that context in the supremacy clause. Armstrong, I believe about a decade later, makes abundantly clear that the supremacy clause is neither a source of rights for the individual, nor is it a cause of action. Those two are fundamentally incompatible. So we think that the holding there from Georgia Latino has simply been aggregated. And now you need to approach it under the Armstrong framework, which is the framework, Your Honor, that I've been trying to discuss about. But Armstrong is whether the Medicaid statutes give you the right to. So once again, Armstrong is about trying to enforce a statutory right, right? Yes. Did I answer? Yeah, and I'm gonna have a question for you about that. You know, just forget about this. No, no, he's not gonna convince me, so just forget about it. Well, maybe one very quick question, Your Honor. Armstrong talks about the ex parte young, the cause of action. And I think you are describing, and it says that those are found in equity. And then the very next section says, in equity, the question that we look at is has Congress displaced that? That's like the first two sentences of that new section that discusses equity. So what I think the Supreme Court and Justice Scalia are doing there is they're saying that tradition of ex parte young has to be run through the new framework of equity. And the question of equity is has Congress displaced that cause of action in this section? And finally, that third section where they address the dissent says even longstanding traditions, like the ex parte young style cause of action or pre-enforcement challenge is subject to the same equitable principles announced in Armstrong. So we really think Armstrong addresses even, if you think it's separate from, say, a direct violation of a statute, we think Armstrong still addresses the equitable cause of action, including the ex parte young style cause of action. Okay, so can you just hum a few bars on mootness? And I think it may be that Judge Huck and I have slightly different mootness questions. We're hung up potentially on different things. Tell me why I guess I'm right to be hung up on this only one court has the thing at a time. Because I think his response is not without some foundation. He says, look, look at 28 U.S.C. 1292A. I'm within the terms. What's your problem? So to that point, Your Honor, you certainly have noticed, and we also focus on the fact that once there's an amended complaint, the original complaint is rendered a legal nullity. We think there's many, or there are multiple 11th Circuit cases that say that. See, and I think you might even say, yeah, granted, but I've got this P.I. motion kind of hanging out there, and the denial of that thing under 1292A gives me a right to appeal that thing. Like, that's the relevant thing, not the complaint, to which I was describing it as adjacent, that maybe that's not the right way of thinking about it. So, Your Honor, the P.I. goes to the original complaint, and so it is the preemption claims under the original complaint, and so by amending the complaint, and you notice the distinction between amending the complaint first before the notice of appeal versus flipping it, which is probably a more muddled set of affairs. Here I think it's clear. It doesn't get out the gate. The P.I., the whole original complaint, as the P.I. that was attached to it, is rendered a legal nullity, and it is a formalist finding, Your Honor, but many questions around jurisdiction are formalist, and we also think it provides a remarkably clear rule for parties. You said the question for mootness is whether it's impossible for us to grant preemption. Explain to me how it's impossible for us to grant preemption. Certainly, Your Honor. So right now, the only question before you is the preliminary injunction on the preemption claim from the original complaint. The judge has since, and this is Judge Hux. And so just to be clear, the amended complaint doesn't really change anything much with that claim, Your Honor. So it does raise two new preemption challenges. It makes clear that there's two causes in equity and two causes in Section 1983, and they do add some facts, but certainly we would agree that the core preemption, they are raising a preemption challenge. So this isn't a situation, for example, where I bring a claim and I say, the stoplight was red, and then I file an amended complaint, and I'm like, you know what, actually, the stoplight was yellow, and the facts, like, eradicate it. It's basically the same record. It is a similar core of facts, yes, Your Honor. So why can't, like, how is it impossible for us to grant them the injunction that they seek? Because a preliminary injunction, all it does is preserve the status of the parties and the status quo until the district court can reach a final ruling on the merits, which the district court has done here on. No, no, it's not. No, it's not. It's not entered into final judgment at all. It dismissed these claims, but that doesn't matter. Well, certainly, Your Honor, the point being that a ruling from the preliminary injunction from this court, even if it was to reverse, has no obligation on the district court to change its ruling at the MTD. I mean, I'll tell you, here's the thing. It may not have a, if we tell the district court, you have to grant this preliminary injunction, is the district court going to grant it? Certainly, Your Honor. Even if not in this case, let's say just another 11th Circuit case was raising the same issue, and that 11th Circuit case came out and said, you know what? Claims like this should go forward. Would the district court change its dismissal order and let those claims go forward? It would have to, right? So, it's not entirely clear to me that it would, Your Honor, because again, I think the district court would be like, I don't care what the 11th Circuit says about claims that are exactly like this. I'm just gonna stand with my dismissal order and wait to be reversed. No, Your Honor. No, certainly not, Your Honor. There's an important distinction between likelihood of success on the merits and the merits, the Supreme Court's University of Texas case makes that distinction clear. But because there are other factors that are still in play, so here, Judge Walker only ruled on likelihood of success of the merits. There's other real questions about whether a preliminary injunction was proper. The delay between the law being enacted.  he'd have to do the preliminary injunction. I mean, I'm saying, wouldn't he undismiss, right? If we said, yes, there's a substantial likelihood of success on the merits here, or just in some other case. I mean, the Supreme Court could say it in a case from the Ninth Circuit. I mean, who knows? He's gonna undismiss those claims, right? So again, Your Honor, I don't think there's anything formally that would require him to, and it comes awfully close to being a very strong advisory opinion on the MTD, which is not before this court saying. I mean, I guess my point is, it's totally up to Judge Walker as to what he wants to do with that dismissal. Because there's no final judgment, he can undismiss them, he can keep it dismissed, he can change his mind on whatever he wants to. What does that have to do with whether we can grant the preliminary injunction? Maybe two quick last points on that, Your Honor. First, again, the fact that this is such a tangled procedural web of what would have to happen and would Judge Walker on his own initiative have to take a couple additional steps shows that I think it is a very awkward fit. And that's where the two mootness claims come together. Not only has the Judge Walker ruled on the issue, but also there's now a different complaint. And so trying to piece together how this court could provide effective relief on now a new amended complaint in which Judge Walker has already ruled on the relevant merits, I think just shows that this is multiple steps removed from any natural effect. If we were to say that the dismissal of claims, not the entry of a final judgment, which would give you the right to appeal, if we were to say that the dismissal of claims precludes any appeal of a preliminary injunction, wouldn't we be telling district courts that they should just dismiss claims so that we can never review a preliminary injunction denial? That seems to be your argument, is that if the district court denies the preliminary injunction, then there's a right to appeal. But a district court can just moot that by just dismissing the claims as well as denying the preliminary injunction. Yes, Your Honor, but a preliminary injunction is a drastic remedy. It's never afforded as right. What it seeks to preserve is that the parties will have a chance at a full briefing and a decision on the merits. That's happened here. And of course, after the Dormant Commerce...  the denial is one. Yes, Your Honor. And they will have a chance to appeal once the Dormant Commerce Clause is issued, the last remaining one below, is dismissed. They'll have a chance for... Then they're appealing the final injunction, not the preliminary injunction. Certainly are. Your Honor, our position is that we're okay saying you had an initial shot with the preliminary injunction, you then had a second shot with the MTD, you have lost on both, and you'll have a final shot at the end once it's properly... And there's no way for the appellate court to review the denial of the preliminary injunction? If the court has... If the district court has later... If the district court dismisses, there's no way for the appellate court to review the denial of the preliminary injunction? There are certainly procedures... They could move to pending jurisdiction. They could move for an interlocutory appeal on the MTD. They could dismiss their Dormant Commerce Clause claim right now and seek to move immediately to final injunctive relief. But again, Your Honor, it's not afforded as of right, and they've had,  two bites at the apple with one coming soon. We think that is a sufficient state of affairs on this movement issue. Okay. Very well. Thank you for your endurance. Thank you, Your Honor. Thank you.  Let's hear from Mr. Nordby on the merits, I understand, right? Yes, Your Honor. Thank you very much. Daniel Nordby for Agriculture Commissioner Wilton... Robert Nordby... ..product, is that pre-carcus? Apart thereof or any product which is the whole... Is that simply, just so I understand the science, is that simply because the initial cell divided and became its own 2 and then its own 4 and then its own 16 or whatever, is that the reason? ... ... Why are they not made from? I think that, I mean, to be a little gross about it, I guess, but aren't I made from my dad's sperm and my mom's egg, even though I don't have them coursing through my veins currently? ... But, I mean, I guess just, I mean, I'm not trying to be sort of flippant about this, but answer my question. Am I made from my mom's egg and my dad's sperm? An ordinary understanding of those terms. ... He's concerned with stuff like chicken salad. It's like a product, it's a food product that's made from those two parts. ... What do we do with the fact that the USDA has decided that this is made from chicken and it's a food product? I mean, we don't have to defer to that, but it just seems, if we were to agree with you on this issue, we would basically be saying, I think, that these chicken things are not regulated under this, right? ... ... ... ... If we were to get to the second merits issue, and the one I think the district court ruled on, if I remember right, what do you say about the Harris case from the Supreme Court? It's the ambulance, the non-ambulatory case, where it seems like there are parts of that Harris case that say,  trying to ban sort of the importation of a meat product based on the way that that was manufactured ...  Okay, very well. Thank you so much. Mr. Sherman, you've got two minutes remaining. ...